UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICHARD MCKUIN and<br>CINDY MCKUIN,<br><br>    Plaintiff(s),<br><br>vs.<br><br>RF ADVISORS, LLC, RONALD WAYNE<br>KLENKE, and J. GREGORY KELLER,<br><br>    Defendant(s). | Case No. 4:03CV1412 JCH |

## **MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Partial Summary Judgment, filed June 3, 2005. (Doc. No. 43). The matter is fully briefed and ready for disposition.

## **BACKGROUND**

By way of background, Plaintiffs established their first of several accounts with R.F. Advisors, LLC ("RF") in 1998. (Defendants' Uncontroverted Facts in Support of Motion for Partial Summary Judgment ("Defendants' Facts"), ¶ 1, citing Klenke Depo. Vol. I, P. 10). Plaintiffs brought more money to Defendants in the spring of 1999, and according to Plaintiffs, the total value of the accounts transferred by 1999 was approximately two million dollars. (Defendants' Memorandum in Support of Motion for Partial Summary Judgment ("Defendants' Memo in Support"), P. 2; see also Compl., ¶ 18). For each of Plaintiffs' accounts at RF, Defendant Ronald Wayne Klenke ("Klenke") was the manager, and Charles Schwab ("Schwab") was the custodian of funds. (Defendants Facts, ¶ 1; Compl., ¶ 17). According to Plaintiff Richard McKuin ("McKuin"), the paramount objective in funding the accounts was to invest in, "safe, solid investments," as the money represented Plaintiffs' life savings and the money for their retirement years. (Plaintiffs' Statement of Material Facts

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

("Plaintiffs' Facts"), P. I-3, citing McKuin Depo. Vol. I, PP. 122, 50, 107, 108).[1] Despite this alleged objective, Plaintiffs assert the majority of the assets were eventually invested in high risk, volatile securities. (Compl., ¶ 19).[2]

In November, 1999, Plaintiffs secured a loan through Founder's Bank, in the amount of $640,000.00. (Compl., ¶¶ 20, 21). Further, in January, 2000, Plaintiffs secured a loan through Allegiant Bank, in the amount of $2,475,000.00. (Id., ¶¶ 22, 23).[3] According to Plaintiffs, all the loan proceeds were invested in high risk, volatile securities. (Compl., ¶ 25).

Plaintiffs initially received monthly reports describing the activity in their accounts from either RF or Schwab. (Defendants' Facts, ¶ 2, citing Brucki Depo., P. 63). Beginning in 1999, however, Plaintiffs received nearly daily lists of their accounts' holdings from RF, including the name and number of shares of each stock and mutual fund in Plaintiffs' accounts, the value of each item, the up or down price movement for the day for each stock, and the 52 week high and low price of each stock. (Id.; see also Defendants' Reply Memorandum in Support of Motion for Partial Summary Judgment ("Defendants' Reply"), P. 8; Plaintiffs' Facts, P. I-5 n. 2). Further, beginning in 2000, and continuing into 2001, McKuin had daily contact with Defendants. (Defendants' Facts, ¶ 4). During these conversations, McKuin would express his concern about the loss of value in the accounts, and

---

[1] Defendants dispute this assertion, maintaining instead that McKuin had, "aggressive growth objectives," and sought to, "increas[e] his wealth rapidly and substantially." (Defendants' Memo in Support, P. 3).

[2] The McKuin accounts were originally invested in mutual funds and money market accounts. (Plaintiffs' Facts, P. I-3). The parties dispute whether Plaintiffs elected to transfer the money in their accounts to riskier investments on the advice of Defendants, or of their own accord. According to Plaintiffs, however, the investment choices were inappropriate, both in terms of Plaintiffs' investment objectives, and because Defendants lacked experience and research ability in the types of investments at issue. (Id., P. I-6).

[3] Plaintiffs maintain they secured the loans, "at the urging of Klenke and Keller and with their consent." (Compl., ¶¶ 20, 22).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the impact of such losses on the repayment of loans he had taken to fund his purchase of securities. (Id., citing McKuin Depo. Vol. I, PP. 95-100; see also Plaintiff's Facts, P. I-5 n. 2).[4]

Plaintiffs filed the instant Complaint on October 3, 2003, naming as Defendants RF, Klenke, and J. Gregory Keller ("Keller"). (Doc. No. 1). In their Complaint, Plaintiffs allege Violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (Claim I); Negligence (Claim II); Breach of Fiduciary Duty (Claim III); and Breach of Contract (Claim IV). Specifically, Plaintiffs complain that Defendants failed to advise Plaintiffs: (1) of the need to diversify and place a reasonable portion of their asserts, particularly those used as collateral for loans, in lower risk securities; (2) of the need to place stop/sell orders, such that if the price fell below a certain level, the security would be sold automatically; (3) of the risk involved in using proceeds from loans to invest in high risk, volatile securities; and (4) of Defendants' lack of expertise and research capacity with respect to the securities at issue. (Compl., ¶¶ 38, 45, 49, 55).

As stated above, Defendants filed the instant Motion for Partial Summary Judgment on June 3, 2005. (Doc. No. 43). In their motion, Defendants seek summary judgment in favor of all Defendants as to Plaintiffs' claims based on § 10(b) and Rule 10b-5; summary judgment in favor of Defendant Keller as to all claims against him; summary judgment in favor of Defendants Keller and Klenke as to Plaintiffs' breach of contract Claim; and summary judgment in favor of all Defendants as to Plaintiffs' request for attorneys' fees. (Id.).[5]

---

[4] Plaintiffs' losses were evident, as the total value of their accounts decreased from well over $5,000,000.00, to $3,288,647.00 in January, 2001, and then to $1,585,478.00 in April, 2001. (Defendants' Reply, PP. 5-6, citing Klenke Declaration, and attached Exhs. A, B, and C thereto).

[5] In their Memorandum in Opposition to Defendants' motion, Plaintiffs concede the Complaint should not include a prayer for attorneys' fees, nor should Keller and Klenke be named as Defendants in Claim IV. (Plaintiffs' Statement of Material Facts and Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment, P. 3).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Id. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I. Federal Securities Law Claims

As stated above, in Claim I of their Complaint, Plaintiffs allege Defendants violated §10(b) of the Securities Exchange Act of 1934, and Rule 10b-5. (Compl., ¶¶ 35-42). According to

- 4 -

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiffs, their claim is one of unsuitability[6]; in other words, Plaintiffs allege that the quality and characteristics of Defendants' investment choices were inappropriate for Plaintiffs' accounts, in light of all the relevant circumstances.[7] (Plaintiffs' Points and Authorities in Opposition to Defendants' Partial Motion for Summary Judgment ("Plaintiffs' Memo in Opp."), P. II-3).

In their Motion for Partial Summary Judgment, Defendants assert Claim I of Plaintiffs' Complaint must be dismissed, as Plaintiffs' federal securities law claims are barred by the applicable statute of limitations. (Defendants' Memo in Support, PP. 6-9). With respect to the statute of limitations, the Eighth Circuit has held as follows:

> The applicable statute of limitations for federal securities fraud claims is the one-year period set forth in section 13 of the 1933 Securities Act, 15 U.S.C. § 77m (1994). Section 13 provides:
>
>> No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, *or after such discovery should have been made by the exercise of reasonable diligence*....[8]

---

[6] To the extent Claim I of Plaintiffs' Complaint may raise other claims and/or allegations, the Court deems those claims abandoned. See Sugarbaker v. SSM Health Care, 190 F.3d 905, 918 (8th Cir. 1999), cert. denied, 528 U.S. 1137 (2000).

[7] The elements of a claim of unsuitability under § 10(b) are: "(1) the broker recommended (or in the case of a discretionary account purchased) securities which are unsuitable in light of the investor's objectives; (2) the broker recommended or purchased the securities with an intent to defraud or with reckless disregard for the investor's interests; and (3) the broker exercised control over the investor's account." O'Connor v. R.F. Lafferty & Co., Inc., 965 F.2d 893, 898 (10th Cir. 1992).

[8] Plaintiffs assert that under the Sarbanes-Oxley Act, 28 U.S.C. § 1658(b), the statute of limitations for their securities fraud claims is now two years (rather than one) after discovery of the facts constituting the violation. (Plaintiffs' Memo in Opp., P. II-1). As explained below, however, Plaintiffs' cause of action accrued no later than January, 2001, a time during which the relevant statute of limitations was one year. Under Eighth Circuit law, the Sarbanes-Oxley Act, enacted on July 30, 2002, does not apply retroactively to revive claims on which the prior statute of limitations has run. In re: ADC Telecommunications, Inc. Securities Litig., 409 F.3d 974, 978 (8th Cir. 2005).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

> 15 U.S.C. § 77m (1994) (emphasis added). Under this provision, even if a victim does not actually know of a misrepresentation, the one-year limitation period begins to run when the victim should have discovered the misrepresentation through the exercise of reasonable diligence. This objective standard is commonly referred to as the doctrine of "inquiry notice." We have held that inquiry notice exists when there are "storm warnings" that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission. When uncontroverted evidence irrefutably demonstrates that a plaintiff had inquiry notice of fraudulent conduct, the issue of notice is amenable to summary judgment.

Great Rivers Co-op. of Southeastern Iowa v. Farmland Industries, Inc., 120 F.3d 893, 896 (8th Cir. 1997) (internal citations omitted).

According to Defendants, Plaintiffs discovered the securities fraud, or should have discovered the fraud, but failed to sue within one year after that discovery. (Defendants' Memo in Support, P. 7). Specifically, Defendants allege Plaintiffs were aware of the facts they claim constituted violations of Section 10(b) and Rule 10b-5 no later than January, 2001, but failed to file suit until October, 2003, more than 33 months after discovering the conduct they now allege was fraudulent. (Id., P. 9).

Under Eighth Circuit law, "there are three determinations a court must make in ascertaining whether the inquiry notice standard has been satisfied: '(1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's misrepresentations.'" Ritchey v. Horner, 244 F.3d 635, 639 (8th Cir. 2001), quoting Great Rivers Co-op., 120 F.3d at 896. Further, "[c]ourts, including our own, that have found facts sufficient as a matter of law to alert a reasonable investor of the possibility of a misrepresentation have generally done so when the record contains evidence that plaintiffs received information directly contrary to the complained-of misrepresentation." Ritchey, 244 F.3d at 640, citing with approval Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

222, 224-25 (1st Cir. 1997) (concluding duty to investigate was triggered where high interest rates, coupled with drastic short-term decline in value, provided inquiry notice that investment was not low-risk, safe and non-speculative, as described).

Upon consideration, the Court finds that summary judgment is appropriate on Plaintiffs' federal securities law claims, as the statute of limitations expired no later than January, 2002. Specifically, with respect to the facts of which Plaintiffs were aware, McKuin's own deposition testimony reveals that as of January, 2001, Plaintiffs knew their investments with Defendants were not performing like the "safe, solid investments" Plaintiffs allegedly desired:

> Q. (by Mr. Greenbaum) So in 2000 and 2001, your contact with R.F. by phone became almost a daily occurrence; is that a correct characterization?
>
> A. (by McKuin) Either by phone or in person, yes....
>
> Q. You were acutely aware of the losses in your account from the beginning of 2001 forward; is that correct?
>
> A. Yes....
>
> Q. Beginning in January of 2001, you were acutely aware of the fact that your losses were substantial and you discussed that with someone from the defendant; correct?
>
> A. Yes.
>
> Q. And you also complained to them of the impact that you perceived associated with the borrowing that you had done to purchase securities; is that correct?
>
> A. Yes.
>
> Q. And you complained to people at R.F. about that beginning in January 2001 or even before that; is that correct?
>
> A. Yes.
>
> Q. Do you think it was even before January 2001?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

| | |
|---|---|
| A. | I expressed my concerns about the way they were handling the account, yes. |
| Q. | When do you think the first time was that you did that? |
| A. | I can't tell you for certain. |
| Q. | But we know that by January 2001, at the latest, you were expressing those complaints about– |
| A. | Yes. |
| Q. | And the complaints pertained to the losses in the account associated with the stock prices going down and associated with your borrowing to purchase securities; is that correct? |
| A. | The entire account, yes, I was concerned about it. |
| Q. | And the decline in stock prices and the amounts you had borrowed to acquire stocks were two of the things that you had made clear to them were upsetting you. Is that your testimony? |
| A. | Yes. |

(McKuin Depo. Vol. I, PP. 96-98). In their Memorandum in Opposition, Plaintiffs do not dispute that as a result of the daily account summaries, they had knowledge of the losses in their accounts more than one year prior to filing suit. (Plaintiffs' Memo in Opp., P. II-2).

Next, while the Court agrees with Plaintiffs that the extreme losses in their accounts did not necessarily alert them to the unsuitability of their investments (Plaintiffs' Memo in Opp., P. II-3), the losses did trigger a duty to investigate the situation further. Ritchey, 244 F.3d at 639. In other words, because the pattern of extreme loss was in direct contradiction to Defendants' alleged representation that the investments were low-risk, safe and non-speculative, Plaintiffs had a duty to investigate the situation further. Id. at 640. Finally, the Court finds that even the most minimal investigation would have revealed that the technology/Internet stocks in which Plaintiffs' accounts were invested were high-risk, aggressive and speculative. Id. Thus, in "the exercise of reasonable

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

diligence, a reasonable person would have acquired actual notice of [Defendants'] alleged misrepresentations" no later than January, 2001, and so the statute of limitations began to run at that time. Great Rivers Co-op., 120 F.3d at 898-99. Plaintiffs' federal securities law claims, filed as they were in October of 2003, were thus out-of-time and must be dismissed. Id.[9]

## II. Claims Against Defendant Keller

In their Motion for Summary Judgment, Defendants next assert Plaintiffs' claims of negligence and breach of fiduciary duty against Defendant Keller must be dismissed, as, "Mr. Keller did not advise plaintiffs, had no contract personally with plaintiffs[10], and plaintiffs lack expert testimony concerning supervision to establish a basis for a lack of supervision claim." (Defendants' Memo in Support, P. 13). To support their claim, Defendants rely on the following deposition testimony from McKuin:

| | | |
|---|---|---|
| Q. (by Mr. Greenbaum) | | Can you identify for me the times that you had direct communications with Mr. Keller? |
| A. (by McKuin) | | There was a Christmas party when they opened their new building. I've seen Greg at I think a couple of different dinners, Frank Papa's Restaurant on Brentwood Boulevard. I may have seen him at the office when I would go in and see Ryan (Chaney) or Wayne (Klenke). |
| Q. | Were your contacts primarily with Ryan or Wayne? | |
| A. | Primarily. | |
| Q. | Did you ever receive any advice or have any substantive discussions with Mr. Keller directly during the time that you had an account with R.F.? | |

---

[9] In light of the above ruling, the Court need not address Defendants' assertion that Plaintiffs have failed to allege the required intent to deceive.

[10] As noted above, Plaintiffs have voluntarily dismissed their breach of contract claim against Defendant Keller.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

A. Not particularly.

(Defendants' Memo in Support, P. 13, quoting McKuin Depo. Vol. I, P. 155). Based on the above, Defendants assert Plaintiffs cannot maintain claims based on any direct involvement on the part of Defendant Keller. (Id., PP. 13-14). Defendants further assert Plaintiffs cannot maintain a claim of negligent supervision, as allegations supporting such a claim are not set forth clearly in Plaintiffs' Complaint, and Plaintiffs' expert, Mr. Jim Brucki, Jr., expressed no opinion concerning supervision in his report or deposition. (Id., P. 14).

Upon consideration, the Court will deny this portion of Defendants' motion. First, the Court notes that Plaintiffs did include allegations regarding supervision in their Complaint. See Compl., ¶ 17. Further, while Plaintiffs admittedly will not offer expert testimony on the issue, Defendants fail to provide case law demonstrating that such testimony is necessary to pursue the claim. See, e.g., Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc., 392 F.2d 472, 478 (8th Cir. 1968) ("It, therefore, appears that the general rule requiring expert testimony to establish a reasonable standard of professional care is necessary when issues are presented that are beyond the ordinary competency of laymen jurors, but is not necessary in passing on commonplace factual situations that the ordinary jury layman can readily grasp and understand"); Jaeger v. Henningson, Durham & Richardson, Inc., 714 F.2d 773, 776 (8th Cir. 1983) (negligence-in-supervision actions with respect to architects typically do not require expert testimony). In light of these circumstances, the Court finds summary judgment in favor of Defendant Keller on Claims II and III to be inappropriate at this time.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. No. 43) is **GRANTED** in part and **DENIED** in part.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Claim I of Plaintiffs' Complaint is **GRANTED**, and Claim I is **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Claims II and III with respect to Defendant Keller is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Claim IV, with respect to Defendants Keller and Klenke, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Plaintiffs' claim for attorneys' fees is **GRANTED**.

Dated this 26th day of July, 2005.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com